**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| LAURA DELAPAZ and JOSHUA TUTTLE-MACEINA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HCA HEALTHCARE, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Laura Delapaz and Joshua Tuttle-Maceina, individually and on behalf of all others similarly situated (collectively, "the Class" or "Class Members"), complain of Defendant as follows, from personal knowledge as to Plaintiffs themselves and on information and belief based on their counsel's reasonable and diligent investigation as to all other matters. Because Defendant has exclusive knowledge of what information was compromised, Plaintiffs reserve the right to supplement these allegations with additional plaintiffs, facts, and injuries as they are discovered.

## I.     NATURE OF THE ACTION

1.     Defendant HCA Healthcare Inc. ("HCA") is a Nashville-based health care company with 182 hospitals and approximately 2,300 sites of care in 20 states. The sites of care include "surgery centers, freestanding ERs, urgent care centers, diagnostic and imaging centers, walk-in clinics and physician clinics."[1]  HCA describes itself as itself as a "one of the nation's leading providers of healthcare services."[2]

---

[1] *Who We Are*, HCA HEALTHCARE, https://hcahealthcare.com/about/ (last visited June 16, 2023).
[2] *Id.*

2. On July 5, 2023, HCA detected hackers infiltrating its systems (the "Data Breach").[3] These unauthorized attackers intentionally compromised HCA's systems and made off with *27 million rows of data*, including Plaintiffs' and Class Members' names, dates of birth, email addresses, phone numbers, and appointment information (the "Personal Information")—in short, much of the information about Plaintiffs and Class Members a health services company would have regarding its patients. On information and belief, the information relates to both adult and child patients of HCA.

3. Troubling, HCA did not inform patients that their personal information was compromised until on or about July 10, 2023. The company has offered no assurance that it has adequately enhanced its data security practices in the wake of the breach or that the compromised data was recovered.

4. On July 5, 2023, DataBreaches.net broke the news that HCA Healthcare data was up for sale on a deep web forum if the HCA did not meet certain demands.[4] HCA, however, has been minimally forthcoming about the details of the Data Breach. On July 10, 2023, HCA posted a privacy update on its website that the Personal Information of *nearly 11 million Americans* was quietly exfiltrated and "was made available by an unknown and unauthorized party on an online forum."[5] The staggering breadth of the Data Breach demonstrates the fatal deficiencies in HCA's data protection measures.

---

[3] Press Release, *Privacy Update – HCA Healthcare Reports Data Security Incident*, HCA HEALTHCARE (July 10, 2023) https://hcahealthcare.com/about/privacy-update.dot#privacyUpdate.

[4] *DEVELOPING: HCA Healthcare patient data for sale on hacking forum?*, DATABREACHES.NET (July 5, 2023) https://www.databreaches.net/developing-hca-healthcare-patient-data-for-sale-on-hacking-forum/.

[5] Press Release, *Privacy Update – HCA Healthcare Reports Data Security Incident*, HCA HEALTHCARE (July 10, 2023) https://hcahealthcare.com/about/privacy-update.dot#privacyUpdate.

5.      HCA has a duty to safeguard and protect members' information entrusted to it and could have prevented this theft by implementing adequate security measures.

6.      Plaintiffs and Class Members entrusted HCA with, and allowed HCA to gather, highly sensitive information relating to their health and other matters as part of seeking medical treatment. They did so in confidence, with the legitimate expectation that HCA would respect their privacy and act appropriately.

7.      Trust and confidence are key components of Defendant's relationship with Plaintiffs and Class Members. Without that trust and confidence, Plaintiffs and Class Members would not have provided Defendant with, or allowed Defendant to collect, their most sensitive information in the first place; Defendant was relied upon by all to keep this information secure (as Defendant is required by law to do).

8.      Plaintiffs bring this class action because Defendant collected but failed to secure and safeguard the valuable Personal Information of patients.

9.      11 million patients had their Personal Information compromised in the Data Breach. As a result of Defendant's failure to protect the consumer information it was entrusted to safeguard, Plaintiffs and Class Members suffered a loss of the value of their Personal Information, and have been exposed to or are at imminent and significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future.

10.     Defendant's intentional, willful, reckless, unfair, and negligent conduct—failing to prevent the breach, failing to limit its severity, and failing to detect it in a timely fashion—harmed Plaintiffs and Class Members uniformly. For this reason, Defendant should pay for monetary damages and appropriate identity theft protection services, as well as reimburse Plaintiffs for the costs caused by Defendant's substandard security practices and failure to timely

disclose the same. Plaintiffs are likewise entitled to injunctive and other equitable relief that safeguards their information, requires Defendant to improve its data security significantly, and provides independent, expert oversight of Defendant's security systems.

11. Defendant has also been unfairly and unjustly enriched because of its improper conduct, such that it would be inequitable for it to retain the benefits conferred upon it by Plaintiffs and the Class Members. Plaintiffs, Class Members, and public agencies never would have entrusted Defendant with its members' Personal Information had they known that Defendant would permit unauthorized access to its Personal Information because of Defendant's complete and utter disregard for security safeguards and protocols. Plaintiffs would have used other providers.

## II.     **JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 Class Members, and minimal diversity exists as Defendant is a citizen of Tennessee and at least once Class Member is a citizen of a different state.

13. This Court has personal jurisdiction over HCA because it is headquartered in Nashville, Tennessee and maintains its principal place of business in this District.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because Defendant's principal place of business is within this District and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District.

## III.     **NAMED PLAINTIFFS**

15. Plaintiff Laura Delapaz ("Plaintiff Delapaz") is a natural person residing in Los Angeles, California. She is a citizen of California.

16.     Plaintiff Delapaz received medical services at an HCA facility in the Los Angeles area.

17.     Plaintiff Delapaz has no relationship with HCA other than in connection with her receipt of health care services.

18.     In order to receive health care services, Plaintiff Delapaz was required to and did provide her private health information and personal information to HCA.

19.     Plaintiff Delapaz received two emails from HCA on July 17, 2023, informing her about the Data Breach.

20.     Plaintiff Joshua Tuttle-Maceina ("Plaintiff Tuttle-Maceina") is a natural person residing in Lebanon, Tennessee.  He is a citizen of Tennessee.

21.     Plaintiff Tuttle-Maceina received medical services at an HCA facility in the Nashville area.

22.     Plaintiff Tuttle-Maceina has no relationship with HCA other than in connection with his receipt of health care services.

23.     In order to receive health care services, Plaintiff Tuttle-Maceina was required to and did provide his private health information and personal information to HCA.

24.     Plaintiff Tuttle-Maceina received an email from HCA on July 10, 2023, informing him about the Data Breach.

25.     Other than the Data Breach, Plaintiffs are aware of no other means by which unauthorized persons could have come into possession of their private health information or personal information. They regularly take steps to safeguard their private information while in their control.

26.     Because their information was accessed and exfiltrated by hackers, Plaintiffs suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of their personal information. Plaintiffs' injuries were exacerbated by Defendant's delay in revealing the Data Breach and notifying impacted patients like Plaintiffs.

27.     Plaintiffs have a continuing interest in ensuring that their personal information, which remains with Defendant, is protected and safeguarded from future breaches.

## IV.     DEFENDANT

28.     Defendant HCA is a Tennessee corporation with its principal place of business in Nashville, Tennessee.

## V.     FACTUAL ALLEGATIONS

### A.     DEFENDANT'S COLLECTION OF PERSONAL INFORMATION

29.     Founded in 1968, HCA is a health services company that owns and operates nearly 200 hospitals and over 2,000 sites of care, including physician clinics, urgent care centers, and emergency rooms.  HCA provides health care services in 20 states: Alaska, California, Colorado, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Missouri, Mississippi, Nevada, New Hampshire, North Carolina, South Carolina, Tennessee, Texas, Utah, and Virginia.

30.     HCA describes itself as "a learning healthcare system that uses its more than 31 million annual patient encounters to advance science, improve patient care and save lives."[6]  It employs 38,000 physicians and 94,0000 nurses.  HCA also claims to be "the largest sponsor of graduate medical education programs in the U.S."  The company has 56 teaching hospitals in 14

---

[6] *HCA Healthcare Welcomes Record Class of 1,453 Residents and Fellows*, BUSINESSWIRE (July 1, 2019) https://www.businesswire.com/news/home/20190701005527/en/HCA-Healthcare-Welcomes-Record-Class-1453-Residents.

states with 3,900 residents and fellows, and anticipates add new programs to accommodate 7,000 additional residents by 2025.

31.     As part of its provision of health care services, HCA collects huge amounts of data relating to patients, including personal details (such as names, dates of birth, addresses, email addresses, telephone numbers, Social Security numbers, and policy numbers), appointment information, details of diagnosis and treatment, and details of claims made and bills received.

## B.     DEFENDANT'S REPRESENTATIONS ABOUT ITS ABILITY TO SECURE MEMBERS' PERSONAL INFORMATION

32.     As HCA acknowledges, the patient personal information in its possession "is protected health information ('PHI') protected by the Health Insurance Portability and Accountability Act of 1996, as amended ('HIPAA'), and the applicable provisions of the Health Information Technology for Economic and Clinical Health (HITECH) Act."[7]  HCA asserts "[j]ust as we strive to protect Personal Information we are committed to protecting your PHI"[8]  It defines "Personal Information" as including "means any information that may be used, either alone or in combination with other information, to personally identify an individual."[9]

33.     HCA claims that "[y]our privacy is important to us" and "[w]e are dedicated to maintaining information confidentiality and complying with regulatory requirements by – among other things – limiting access to only those users that have a legitimate need to view it, and regularly educating employees on information protection."[10]

---

[7] HCA HEALTHCARE, *Privacy Policy* (May 30, 2018) https://hcahealthcaretoday.com/privacy-policy/#:~:text=We%20may%20disclose%20Personal%20Information,including%20investigations%20of%20potential%20violations.
[8] *Id.*
[9] *Id.*
[10] *Id.*

C.     **THE DATA BREACH**

34.     Due to HCA's deficient security controls, a data hacker was permitted to roam at large throughout HCA's system, until HCA claims to have discovered the Data Breach on July 5, 2023.[11]  HCA learned about the Data Breach because the data hacker posted a sample of the stolen data on an online forum.  HCA did *not* learn about the Data Breach through its own data security system.

35.     HCA says its investigation is ongoing but it believes "that the list contains approximately 27 million rows of data that may include information for approximately 11 million HCA Healthcare patients."[12]  The compromised patient information includes: patient name, city, state, zip code, email, telephone number, date of birth, gender, patient service date, location and next appointment date.[13]  The stolen data also appears to include patient visit or "encounter" information with medical providers and the name of the health care facility.[14]

36.     HCA claims to have taken immediate steps to secure its systems and begin an investigation.[15] As noted above, however, whatever efforts it took were far too little, far too late; the hacker had already taken everything they wanted.

37.     Further, HCA claims to have "several robust security strategies, systems, and protocols in place to help protect data"[16]  This empty assurance does not allow Plaintiffs to form

---

[11] Press Release, *Privacy Update – HCA Healthcare Reports Data Security Incident*, HCA HEALTHCARE (July 10, 2023) https://hcahealthcare.com/about/privacy-update.dot#privacyUpdate.
[12] *Id.*
[13] *Id.*
[14] *DEVELOPING: HCA Healthcare patient data for sale on hacking forum?*, DATABREACHES.NET (July 5, 2023) https://www.databreaches.net/developing-hca-healthcare-patient-data-for-sale-on-hacking-forum/.
[15] Press Release, *Privacy Update – HCA Healthcare Reports Data Security Incident*, HCA HEALTHCARE (July 10, 2023) https://hcahealthcare.com/about/privacy-update.dot#privacyUpdate.
[16] *Id.*

even a general notion of the nature or extent of HCA's remedial measures, but in light of the magnitude of the Data Breach, the vulnerabilities to be remedied must have been pervasive and fundamental.

### D. DEFENDANT'S NOTICE WAS DEFICIENT

38.     Defendant's webpage concerning the Data Breach is deficient in its content and delivery.

39.     The webpage does not provide critical information. It does not disclose how hackers were able to get inside HCA's systems without detection, and how they were able to exfiltrate vast amounts of data without detection.

40.     Moreover, Defendant's webpage supplies only broad categories of the kinds of information taken (such as "patient service date, location and next appointment date") rather than explaining precisely what Personal Information was stolen.[17]

41.     Defendant's webpage also fails to explain the extent to which the unauthorized attackers were able to compromise its systems, stating vaguely that "a list of certain information with respect to some of its patients was made available by an unknown and unauthorized party on an online forum" and that it "appears to be a theft from an external storage location" used to automate email messages.[18]

42.     Thus, Plaintiffs and Class Members are left to their own devices in trying to understand what happened with their Personal Information, what risks they face, and the period during which their Personal Information was improperly taken.

### E. DEFENDANT FAILED TO SAFEGUARD PERSONAL INFORMATION

43.     Defendant failed to exercise reasonable care in protecting patient information.

_____

[17] *Id.*
[18] *Id.*

44. Defendant has a nondelegable duty under federal law to ensure that all information it collects and stores is secure, and that any associated entities with whom it shares information maintain adequate and commercially reasonable data security practices to ensure the protection of patient Personal Information.

45. Indeed, Defendant's entire business depends on patients with which it has a relationship entrusting it with sensitive Personal Information, without which HCA could not drive a profit from its health care services.

46. More specifically, Defendant knows that patients must trust HCA to keep patient health information private and secure. If those patients lack trust in HCA or know they insecurely store, safeguard, or transmit patient Personal Information, then they would choose a different company for the health care services HCA provides.

47. Defendant is an entity covered by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), *see* 45 C.F.R. § 160.102, and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

48. These rules establish national standards for the protection of patient information, including "protected health information," defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. *See* 45 C.F.R. § 160.103.

49.     HIPAA limits the permissible uses of "protected health information," prohibits unauthorized disclosures of "protected health information," and requires that Defendant implement appropriate safeguards for this information.

50.     HIPAA requires that Defendant provide notice of a breach of unsecured protected health information—which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons (i.e., unencrypted data)—without unreasonable delay. *See* 45 C.F.R. Part 164, Subpart D ("Notification in the Case of Breach of Unsecured Protected Health Information"). "[I]n no case" shall the notice be delivered "later than 60 calendar days after discovery of a breach." 45 C.F.R. § 164.404(b).

51.     Notably, to assist a covered entity like Defendant in complying with its data security and privacy obligations, the U.S. Department of Health and Human Services (HHS) "has developed guidance and tools to assist . . . in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards . . . ."[19]

52.     Defendant proclaims on its website that it "committed to the care and improvement of human life, and that includes protecting Personal Information" and that it is required to safeguard protected health information ("PHI") under HIPAA.[20]

53.     Despite these requirements, the ample guidance HHS supplies for meeting them, and Defendant's representations, Defendant failed to implement appropriate safeguards to

---

[19] *See* U.S. DEP'T OF HEALTH & HUMAN SERVS., *HIPAA Security Guidance*, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited June 8, 2023).

[20] HCA HEALTHCARE, *Privacy Policy* (May 30, 2018) https://hcahealthcaretoday.com/privacy-policy/#:~:text=We%20may%20disclose%20Personal%20Information,including%20investigations%20of%20potential%20violations.

protect patient private medical information and failed to provide a clear and timely notice of the threat to patient information.

54. The Data Breach indicates that HCA's systems detect to intrusion, unusual activity, and to log and report such events were inadequate and not in compliance with industry standards.

55. HCA violated HIPAA by failing to:

a. maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. adequately protect Plaintiffs' and Class Members' Personal Information;

c. ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d. implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e. implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3); and

h. ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4).

56. In addition to the HHS guidance discussed above, other federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission (FTC) has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[21]

57. The FTC's *Protecting Personal Information: A Guide for Business* sets forth fundamental data security principles and practices for businesses to implement and follow to protect sensitive data. Among other things, it notes that businesses should: (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large volumes of data being transmitted from their system, and have a response plan ready in the event of a breach.[22]

---

[21] *See* FTC, *Start With Security: A Guide for Businesses*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed June 8, 2023).
[22] *Id.*

58.     Additionally, the FTC recommends that organizations limit access to sensitive data, require the use of complex passwords on networks, employ industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[23]

59.     The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[24]

60.     Defendant was fully aware of its obligations to implement and use reasonable measures to protect the Personal Information of Plaintiffs and Class Members, but failed to comply with these basic recommendations and guidelines that would have prevented the Data Breach from occurring.

F.     **PLAINTIFFS' AND CLASS MEMBERS' PERSONAL INFORMATION IS HIGHLY VALUABLE.**

61.     Defendant was or should have been aware that it was collecting highly valuable data, which has increasingly been the target of data breaches in recent years.[25]

62.     As early as 2014, the FBI alerted the healthcare industry that it was increasingly a preferred target of hackers, stating "[t]he FBI has observed malicious actors targeting healthcare

---

[23] *Id.*

[24] FTC, *Privacy and Security Enforcement*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last accessed June 8, 2023).

[25] Healthcare Data Breach Statistics, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last accessed June 8, 2023) ("Our healthcare data breach statistics clearly show there has been an upward trend in data breaches over the past 10 years.").

related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or Personally Identifiable Information (PII)" so that these companies could take the necessary precautions to thwart such attacks.[26]

63.     Further, Cathy Allen, CEO of Shared Assessments, a cyber-risk management group, stated that "just the types of test proscribed might indicate a type of illness that you would not want employers or insurance companies to have. Thieves often steal and resell insurance data on the internet . . . having other information makes the data more valuable and the price higher."[27]

64.     Personal Information is a valuable commodity to identity thieves. Compromised Personal Information is traded on the "cyber black-market." As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers, Social Security numbers, and other Personal Information on the dark web, making the information publicly available.[28] (As detailed above, that is just what happened to Plaintiffs' and Class Members' information here.)

---

[26] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, REUTERS, Aug. 20, 2014, http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820 (last accessed June 8, 2023).
[27] *Id.*
[28] *Here's How Much Your Personal Information Is Selling for on the Dark Web,* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed June 8, 2023); McFarland et al., *The Hidden Data Economy*, at 3, https://www.mcafee.com/enterprise/en-us/assets/reports/rp-hidden-data-economy.pdf (last accessed June 8, 2023).

65.     Healthcare data is especially valuable on the black market. According to one report, a healthcare data record may be valued at up to $250 per record, compared to $5.40 for the next highest value record (a payment card).[29]

66.     According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on the black market "includes names, birth dates, policy numbers, diagnosis codes and billing information."[30] Fraudsters commonly use that data "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[31]

67.     According to Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, "[h]ealth information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an individual."[32] For this reason, a patient's full medical records can sell for up to $1,000 on the dark web, while credit card numbers and Social Security numbers may cost $5 or less.[33]

68.     As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies:

---

[29] *Hackers, Breaches, and the Value of Healthcare Data* (June 20, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers/ (last accessed June 8, 2023).

[30] Jim Finkle, *Your medical record is worth more to hackers your credit card*, Reuters, https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924 (last accessed June 8, 2023).

[31] *Id.*

[32] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed June 8, 2023).

[33] Paul Nadrag, *Here's How Much Your Personal Information Is Selling for on the Dark Web* (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited June 8, 2023).

The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans.[34]

G.   **DEFENDANT HARMED PLAINTIFFS AND CLASS MEMBERS BY ALLOWING ANYONE TO ACCESS THEIR PERSONAL INFORMATION.**

69.    Defendant knew or should have known both that medical information is incredibly valuable to hackers and that health care data breaches are on the rise. Accordingly, Defendant was on notice for the harms that could ensue if they failed to protect patient medical data.

70.    Given the sensitive nature of the Personal Information stolen in the Data Breach—including patient name, city, state, zip code, email, telephone number, date of birth, gender, and health information, such as patient service date, location and next appointment date, and medical encounter information —hackers have the ability to commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and in the indefinite future.

71.    Plaintiffs and Class Members may already be experiencing harms as the result of the Data Breach, including, but not limited to, identity theft, financial fraud, tax fraud, unauthorized lines of credit opened in their names, and medical and healthcare fraud. Plaintiffs

_____

[34] *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last visited June 8, 2023).

and Class Members will also have to spend time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit protection services, contacting their financial institutions, checking credit reports, and spending time and effort searching for unauthorized activity.

72. The Personal Information exposed in the Data Breach is highly coveted and valuable on underground or black markets.

73. Identity thieves can use the stolen information to: (a) create fake credit cards that are used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest. Further, loss of private and personal health information can expose the victim to loss of reputation, loss of employment, blackmail, extortion, and other negative effects.

74. While federal law generally limits an individual's liability for fraudulent credit card charges to $50, there are no such protections for a stolen medical identity. According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity theft spent an average of $13,500 in out-of-pocket costs to resolve the crime.[35] Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%).

---

[35] *Ponemon Institute*, *Fifth Annual Study on Medical Identity Theft*, https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 (last accessed June 8, 2023).

75.     According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an imposter and verifying their personal health information, medical invoices and claims and electronic health records are accurate."[36]

76.     Additionally, the study found that medical identity theft can have a negative impact on reputation as 45% of respondents said that medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions, with 19% responding that they missed out on employment opportunities as a result.[37]

77.     Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[38] In some cases, victims may not even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[39]

78.     Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;

---

[36] *Id.* at 2.
[37] *Id.* at 14.
[38] *Id.* at 1.
[39] *Id.*

- Get contacted by a debt collector about medical debt they do not owe;

- See medical collection notices on their credit report that they do not recognize;

- Find erroneous listings of office visits or treatments on their explanation of benefits;

- Receive information from their health plan that they have reached their limit on benefits; or

- Are denied insurance because their medical records show a condition they do not have.[40]

79.     Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[41] According to Tom Kellermann, "[t]raditional criminals understand the power of coercion and extortion. By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[42] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

80.     As explained further by the FTC, medical identity theft can have other serious consequences:

> Medical ID thieves may use your identity to get treatment – even surgery – or to bilk insurers by making fake claims. Repairing

---

[40] *FTC, Medical Identity Theft FAQs for Health Care Providers and Health Plans*, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last accessed June 8, 2023).

[41] Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed June 8, 2023).

[42] *Id.*

damage to your good name and credit record can be difficult enough, but medical ID theft can have other serious consequences. If a scammer gets treatment in your name, that person's health problems could become a part of your medical record. It could affect your ability to get medical care and insurance benefits, and could even affect decisions made by doctors treating you later on. The scammer's unpaid medical debts also could end up on your credit report.[43]

81.     According to a 2023 study, the costs incurred by data-breach victims are "real and substantial, and can persist for years after a breach occurs."[44]

82.     The authors examined a 2012 breach of tax records from the South Carolina Department of Revenue, which included "Social Security numbers and complete tax returns—information that swindlers could use to open new bank or credit-card accounts or borrow money in victims' names," similar to the Social Security numbers and billing information that was taken in the Data Breach here. A "substantial portion of South Carolina's population" was affected by the breach.[45]s

83.     The authors found that, controlling for various demographic and economic factors, South Carolina residents faced substantial costs as a likely result of the breach. Mortgage application denials rose by 4 percent in the four years following the breach (compared to 1.6 percent increases in two comparator states, Georgia and North Carolina). Loan amounts rose by $1,095 (compared to $437 in Georgia and North Carolina). Reported incidents of wire fraud rose

---

[43] *Medical ID Theft: Health Information for Older People*, Federal Trade Commission, https://web.archive.org/web/20201019075254/https://www.consumer.ftc.gov/articles/0326-medical-id-theft-health-information-older-people (last accessed June 8, 2023).

[44] Min-Seok Pang & Anthony Vance, *Your Personal Data Has Been Stolen. Will It Really Cost You Anything?*, Wall Street Journal (June 6, 2023), https://www.wsj.com/articles/personal-data-stolen-what-cost-you-f0c8e6a1 (last accessed June 12, 2023) (discussing results of Min-Seok Pang & Anthony Vance, *Breached and Denied: The Cost of Data Breaches on Individuals as Mortgage Application Denials* (forthcoming), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4451577 (last accessed June 12, 2023)).

[45] *Id.*

by 20 percent (compared to 7 percent in all other states). Consumer complaints about credit cards and credit reporting likewise saw larger jumps than in other states.[46]

84. As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

      a.      losing the inherent value of their Personal Information;

      b.      identity theft and fraud resulting from the theft of their Personal Information;

      c.      costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

      d.      costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

      e.      unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

      f.      lowered credit scores resulting from credit inquiries following fraudulent activities;

      g.      costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges,

---

[46] *Id.*

cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts; and

      h.     the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Personal Information being in the possession of one or many unauthorized third parties.

     85.     Plaintiffs and Class Members place significant value in data security. According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[47]

     86.     Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, Defendant would have no reason to tout its data security efforts to their public and private clients.

     87.     Consequently, had patients known the truth about Defendant's data security practices—that they did not adequately protect and store patient Personal Information—they would not have entrusted patient Personal Information to Defendant.

---

[47] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 2016), https://www2.fireeye.com/rs/848-DID-242/images/rpt-beyond-bottomline.pdf (last visited June 8, 2023).

I.    **CLASS DEFINITIONS**

  A.    **NATIONWIDE CLASS**

  88.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following nationwide class (the "Nationwide Class" or the "Class"):

> All natural persons residing in the United States whose Personal
> Information was compromised in the Data Breach.

  89.    The Nationwide Class asserts claims against each Defendant for negligence (Count 1), negligence *per se* (Count 2), breach of confidence (Count 3), unjust enrichment (Count 4), and deceptive trade practices (Count 5).

  90.    The California Subclass is defined as:

> All natural persons residing in California whose Personal Information was
> compromised in the Data Breach.

  91.    The California Subclass, together with the Nationwide Class, are collectively referred to herein as the "Classes" or the "Class."

  B.    **SUBCLASS**

  92.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff Delapaz seeks certification of state-by-state claims in the alternative to the nationwide claims, as well as statutory claims under each relevant state's laws, defined as follows:

> All natural persons residing in the [STATE] whose Personal
> Information was compromised in the Data Breach.

  93.    Excluded from the definitions above are Defendant, any entity in which Defendant has a controlling interest, and any of Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any

judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

94. Plaintiffs reserve the right to modify or amend the definitions above before the Court determines whether certification is appropriate.

## II. THE PROPOSED CLASSES MEET THE REQUIREMENTS OF RULE 23.

95. **Numerosity. Federal Rule of Civil Procedure 23(a)(1)**. The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, Defendant has represented on its website that 11 million patients are affected by the Data Breach. Those individuals' names and addresses are available from Defendant's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods. Joinder of all Class Members is impracticable.

96. **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a. Whether Defendant had a duty to protect Personal Information;

b. Whether Defendant failed to take reasonable and prudent security measures;

c. Whether Defendant was negligent in failing to implement reasonable and adequate security procedures and practices;

d. Whether Defendant's security measures to protect its systems were reasonable in light known legal requirements;

e. Whether Defendant's efforts (or lack thereof) to ensure the security of its members' Personal Information were reasonable in light of known legal requirements;

f. Whether Defendant's conduct constituted unfair or deceptive trade practices;

g. Whether Defendant violated state law when it failed to implement reasonable security procedures and practices;

h. Which security procedures and notification procedures Defendant should be required to implement;

i. Whether Defendant violated state consumer protection and data breach statutes in connection with the actions described herein;

j. Whether Defendant failed to notify Plaintiffs and Class Members as soon as practicable and without delay after the Data Breach was discovered;

k. Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach and/or the loss of the Personal Information of Plaintiffs and Class Members;

l. Whether Plaintiffs and Class Members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect their Personal Information; and

m. Whether Plaintiffs and Class Members are entitled to damages or injunctive relief.

97. **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of those of other Class Members. Plaintiffs' Personal Information was in Defendant's possession at the time of the Data Breach and was compromised as a result of the

Data Breach. Plaintiffs' damages and injuries are akin to other Class Members and Plaintiffs seek relief consistent with the relief of the Class.

98. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are an adequate representative of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

99. **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties

and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

100. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for Defendant or would be dispositive of the interests of members of the Class.

101. **Ascertainability.** The Class and Subclass are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within them. The Class and Subclass consist of individuals whose information was supplied to Defendant. Class membership can be determined using Defendant's records—presumably also how Defendant was able to provide notice of breach letters to Class Members.

102. **Injunctive Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to the Class as a whole. Injunctive relief is necessary to uniformly protect Class Members' data. Plaintiffs seek prospective injunctive relief as a wholly separate remedy from any monetary relief.

103. **Issues Class.** Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

        a.      Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Personal Information;

b.    Whether Defendant failed to take commercially reasonable steps to safeguard the Personal Information of Plaintiffs and the Class Members;

c.    Whether Defendant was unfairly and unjustly enriched as a result of its improper conduct, such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the other Class Members; and

d.    Whether adherence to HIPAA regulations, FTC data security recommendations, industry standards, and measures recommended by data security experts would have reasonably prevented the Data Breach.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT 1**</u>

<u>**NEGLIGENCE**</u>

**(On Behalf of Plaintiffs and All Class Members)**

104.    Plaintiffs repeat the allegations contained in the preceding paragraphs as if fully set forth herein.

105.    Defendant required Plaintiffs and Class Members to submit Personal Information to provide health care services. Defendant collected and stored the Personal Information for commercial gain.

106.    Defendant knew or should have known that its systems were vulnerable to unauthorized access and exfiltration by third parties.

107.    Defendant had a non-delegable duty to maintain adequate and commercially reasonable data security practices to ensure the protection of its members' Personal Information.

108.    Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members'

Personal Information within its control from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

109.    Defendant owed a duty of care to Plaintiffs and Class Members to provide security, consistent with industry standards, to ensure that the systems and networks Defendant utilized adequately protected their Personal Information.

110.    Defendant's duty to use reasonable security measures arose from the special relationship that existed between Defendant, and Plaintiffs and Class Members. The special relationship arose because Plaintiffs and Class Members entrusted Defendant with their Personal Information as part of their healthcare services. Only Defendant was in a position to ensure that it had sufficient safeguards to protect against the harm to Plaintiffs and Class Members that would result from a data breach.

111.    Defendant's duty to use reasonable care in protecting Personal Information arose from the common law and the statutes and regulations, as well as its own promises regarding privacy and data security to patients. This duty exists because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. By collecting and maintaining the personal and confidential information of Plaintiffs and Class Members and acknowledging that this information needed to be kept secure, it was foreseeable that they would be harmed in the future if Defendant did not protect Plaintiffs' and Class Members' Personal Information from hackers.

112.    Defendant's duties also arose under HIPPA regulations, which, as described above, apply to Defendant and establish national standards for the protection of patient information, including protected health information, which require Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have

in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

113. Defendant's duties also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal and confidential information. Various FTC publications and data security breach orders further establish Defendant's duty. Tennessee's deceptive trade practices act, provided in Title 47, Chapter 18 of the Tennessee Code, imposes similar duties.

114. Defendant knew, or should have known, of the risks inherent in collecting and storing Personal Information, the vulnerabilities of its systems, and the importance of adequate security.

115. Defendant breached its common law, statutory, and other duties—and thus was negligent—by failing to use reasonable measures to protect its members' Personal Information, and by failing to provide timely and adequately detailed notice of the Data Breach.

116. Defendant breached its duties to Plaintiffs and Class Members in numerous ways, including by:

   a. Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiffs' and Class Members' Personal Information;

   b. Failing to comply with industry standard data security standards during the period of the Data Breach;

c.      Failing to comply with regulations protecting the Personal Information at issue during the period of the Data Breach;

d.      Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

e.      Failing to recognize in a timely manner that Plaintiffs' and other Class Members' Personal Information had been compromised; and

f.      Failing to timely and adequately disclose that Plaintiffs' and Class Members' Personal Information had been improperly acquired or accessed.

117.    Plaintiffs' and Class Members' Personal Information would not have been compromised but for Defendant's wrongful and negligent breach of its duties.

118.    Defendant's failure to take proper security measures to protect sensitive Personal Information of Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiffs' and Class Members' Personal Information.

119.    It was also foreseeable that Defendant's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiffs and Class Members as described in this Complaint.

120.    Neither Plaintiffs nor the other Class Members contributed to the Data Breach and subsequent misuse of their Personal Information.

121.    As a direct and proximate cause of Defendant's conduct, Plaintiffs and Class Members suffered damages and will suffer damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the Personal Information of Plaintiffs and Class

Members; damages arising from identity theft or fraud; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take years to discover and detect; and loss of the value of their privacy and confidentiality of the stolen confidential data, including health data.

## COUNT 2

## NEGLIGENCE PER SE

### (On Behalf of Plaintiffs and All Class Members)

122.    Plaintiffs repeat the allegations contained in the preceding paragraphs as if fully set forth herein.

123.    Defendant is an entity covered by HIPAA, 45 C.F.R. § 160.102, and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

124.    HIPAA requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

125.    HIPAA further requires Defendant to disclose the unauthorized access and theft of the Personal Information to Plaintiffs and Class Members "without unreasonable delay" so that Plaintiffs and Class Members can take appropriate measures to mitigate damages, protect

against adverse consequences, and thwart future misuse of their Personal Information. *See* 45 C.F.R. §§ 164.404, 406, & 410.

126.     Defendant violated HIPAA by failing to reasonably protect Plaintiffs' and Class Members' Personal Information, as described herein.

127.     Defendant's violations of HIPAA constitute negligence per se.

128.     Plaintiffs and Class Members are within the class of persons that HIPAA was designed to protect.

129.     The harm that occurred due to the Data Breach is the type of harm against which HIPAA was intended to guard.

130.     Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant's, of failing to use reasonable measures to protect Personal Information. 15 U.S.C. § 45(a)(1). Tennessee law imposes similar duties. *See* Tenn. Code Ann. § 47-18-104.

131.     The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

132.     Defendant violated Section 5 of the FTC Act and analogous provisions of Tennessee law by failing to use reasonable measures to protect Personal Information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Personal Information it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving companies as large as HCA, including, specifically, the immense damages that would result to Plaintiffs and Class Members.

133. Defendant's violations of Section 5 of the FTC Act and analogous provisions of Tennessee law constitute negligence per se.

134. Plaintiffs and Class Members are within the class of persons that the FTC Act and analogous provisions of Tennessee law were intended to protect.

135. The harm that occurred due to the Data Breach is the type of harm against which the FTC Act and analogous provisions of Tennessee law were intended to guard. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm Plaintiffs and Class Members have suffered.

136. As a direct and proximate result of Defendant's negligence per se, Plaintiffs and Class Members have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

## COUNT 3

## BREACH OF CONFIDENCE

### (On Behalf of Plaintiffs and All Class Members)

137. Plaintiffs repeat the allegations contained in the preceding paragraphs as if fully set forth herein.

138. Plaintiffs and Class Members maintained a confidential relationship with Defendant whereby Defendant undertook a duty not to disclose the Personal Information provided by Plaintiffs and Class Members to Defendant to any unauthorized third party or parties. Such Personal Information was confidential and novel, highly personal and sensitive, and not generally known.

139. Defendant knew Plaintiffs' and Class Members' Personal Information was being disclosed in confidence and understood the confidence was to be maintained, including by

expressly and implicitly agreeing to protect the confidentiality and security of the Personal Information they collected, stored, and maintained.

140.    Defendant required Plaintiffs and Class Members to provide their Personal Information in order to receive health care services.

141.    As a result of the Data Breach, there was an unauthorized disclosure of Plaintiffs' and Class Members' Personal Information in intentional, knowing, and/or negligent breach of this duty. The unauthorized disclosure occurred because Defendant failed to implement and maintain reasonable safeguards to protect the Personal Information in its possession and failed to comply with industry-standard data security practices.

142.    Plaintiffs and Class Members were harmed by way of an unconsented disclosure of their confidential information to unauthorized third parties.

143.    As a direct and proximate result of Defendant's breach of confidence, Plaintiffs and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiffs and Class Members alternatively seek an award of nominal damages.

## COUNT 4

## UNJUST ENRICHMENT

### (On Behalf of Plaintiffs and All Class Members)

144.    Plaintiffs repeat the allegations contained in the preceding paragraphs as if fully set forth herein.

145.    Defendant's business model depended upon patients entrusting it with their Personal Information. Trust and confidence are critical and central to both the services provided by Defendant to patients, and the billing and collection for such services. Unbeknownst to Plaintiffs and Class Members, however, Defendant failed to reasonably or adequately secure, safeguard, and otherwise protect Plaintiffs' and Class Members' Personal Information.

- 36 -

Defendant's deficiencies described herein were contrary to the information they provided to Plaintiffs and Class Members.

146.     Plaintiffs and Class Members engaged Defendant for services and provided Defendant with, and allowed Defendant to collect, their Personal Information on the mistaken belief that Defendant complied with their duty to safeguard and protect patient Personal Information. Defendant knew that the manner in which it maintained and transmitted patient Personal Information violated their fundamental duties to Plaintiffs and Class Members by disregarding industry-standard security protocols to ensure confidential information was securely transmitted and stored.

147.     By July 5, 2023, Defendant had within its exclusive knowledge that it had failed to implement adequate security measures to keep patients' Personal Information secure. This information was not available to Plaintiffs, Class Members, or the public at large until several days or weeks after the Data Breach.

148.     Defendant also knew that Plaintiffs and Class Members expected that their personal medical information would be kept secure against known security risks. And based on this expectation and trust, Defendant knew that Plaintiffs and Class Members would not have disclosed health information to them and would have chosen different service providers if Plaintiffs and Class Members knew those expectations were not met.

149.     Plaintiffs and Class Members did not expect that Defendant would store or transmit their Personal Information insecurely.

150.     Had Plaintiffs and Class Members known of Defendant's deficient security practices, Plaintiffs and Class Members would not have engaged Defendant to perform any services and would never have provided Defendant with their Personal Information.

151. By withholding these material facts, Defendant put its own interests ahead of patient interests and benefitted themselves to the detriment of Plaintiffs and Class Members.

152. As a result of their conduct as alleged herein, Defendant sold more health care services than they otherwise would have and were able to charge Plaintiffs and Class Members when they otherwise could not have. Defendant was unjustly enriched by charging and collecting for those services to the detriment of Plaintiffs and Class Members.

153. To be sure, this is not a question of whether Defendant misused patient Personal Information. It is more foundational. Defendant promised to protect and safeguard Plaintiffs' and Class Members' Personal Information at all times (from the inception of their relationship of trust and confidence) and never would have performed any services of value enabling them to bill or collect payment but for Defendant's unfair and deceptive practices.

154. It would be inequitable, unfair, and unjust for Defendant to retain these wrongfully obtained benefits. Defendant's retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

155. Defendant's defective security and its unfair and deceptive conduct has, among other things, caused Plaintiffs and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their private Personal Information.

156. Plaintiffs and Class Members are entitled to restitution and non-restitutionary disgorgement in the amount by which Defendant was unjustly enriched, to be determined at trial.

## COUNT 5

## DECEPTIVE TRADE PRACTICES (TENN. CODE ANN. § 47-18-104)

**(On Behalf of Plaintiffs and All Class Members)**

157. Plaintiffs repeat the allegations contained in the preceding paragraphs as if fully set forth herein.

158.    Defendant violated Tenn. Code Ann. § 47-18-104 by engaging in deceptive acts or practices in the conduct of its business and the furnishing of its services in the State of New Tennessee.

159.    Defendant's deceptive practices include omitting, suppressing, and concealing the material fact that it did not have and did not reasonably ensure that it reasonably or adequately secured Plaintiffs' and Class Members' Personal Information.

160.    Defendant engaged in acts of deception and false pretense in connection with its accepting, collecting, securing, and otherwise protecting patient Personal Information and engaged in the following deceptive trade practices, including:

    a.    Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiffs' and Class Members' Personal Information;

    b.    Failing to comply with data security standards during the period of the Data Breach;

    c.    Failing to comply with regulations protecting the Personal Information at issue during the period of the Data Breach;

    d.    Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

    e.    Failing to recognize in a timely manner that Plaintiffs' and other Class Members' Personal Information had been compromised; and

    f.    Failing to timely and adequately disclose that Plaintiffs' and Class Members' Personal Information had been improperly acquired or accessed.

161.    Plaintiffs' and Class Members' Personal Information would not have been compromised but for Defendant's wrongful and unfair breach of its duties.

162.    Defendant's failure to take proper security measures to protect sensitive Personal Information of Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiffs' and Class Members' Personal Information.

163.    Plaintiffs and Class Members conferred a benefit on Defendant—payment for medical services—in reliance on Defendant's omissions and deceptive practices. Had Defendant disclosed in any form, whether verbally, in writing, or via electronic disclosure that it did not adequately secure patients' Personal Information, Plaintiffs and Class Members would not have sought or purchased services from Defendant.

164.    As a direct and proximate result of Defendant's fraudulent acts and practices, Plaintiffs and Class Members were injured and lost money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant as they would not have paid Defendant for goods and services or would have paid less for such goods and services but for Defendant's violations alleged herein.

165.    Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's fraudulent business practices or use of their Personal Information; reasonable attorneys' fees and costs under Tenn. Code Ann. § 47-18-109; injunctive relief; and other appropriate equitable relief.

## COUNT 6

## CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT,

### Cal. Civ. Code §§ 56, et seq.

#### (On Behalf of Plaintiff Delapaz and California Subclass Members)

- 40 -

166. Plaintiff Delapaz, individually and on behalf of the California Subclass, repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

167. California's Confidentiality of Medical Information Act ("CMIA") requires a healthcare provider "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information [to] do so in a manner that preserves the confidentiality of the information contained therein." Cal. Civ. Code § 56.101. "Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." *Id*.

168. The CMIA further requires that "[a]n electronic health record system or electronic medical record system . . . [p]rotect and preserve the integrity of electronic medical information." Cal. Civ. Code § 56.101(b)(1)(A).

169. Plaintiff Delapaz and California Subclass members are "patient[s]," "whether or not still living, who received health care services from a provider of health care and to whom medical information pertains" pursuant to § 56.05(j) of the CMIA.

170. Defendant is a "provider of healthcare" pursuant to § 56.05(m) of the CMIA "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information."

171. Defendant is subject to the requirements and mandates of the CMIA and are therefore required to do the following under the CMIA:

    a.    Ensure that medical information regarding patients is not disclosed or disseminated or released without patients' authorization, and to protect and preserve the confidentiality of the medical information regarding a patient, under Cal. Civ. Code §§ 56.06, 56.10, 56.13, 56.245, 56.26, 56.35, 56.36, and 56.101;

b.    Not disclose medical information regarding a patient without first obtaining an authorization under Cal. Civ. Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, and 56.35;

c.    Create, maintain, preserve, and store medical records in a manner that preserves the confidentiality of the information contained therein under Cal. Civ. Code §§ 56.06 and 56.101(a);

d.    Protect and preserve confidentiality of electronic medical information in their possession under Cal. Civ. Code §§ 56.06 and 56.101(b)(1)(A); and

e.    Take appropriate preventive actions to protect confidential information or records from unauthorized release under Cal. Civ. Code § 56.36I(2)(E).

172.    The Personal Information of Plaintiff Delapaz and California Subclass members compromised in the Data Breach constitutes "medical information" maintained in electronic form pursuant to § 56.05(j) of the CMIA.

173.    The medical information compromised included Plaintiff Delapaz's and California Subclass members' full names, dates of birth, phone numbers, email addresses, genders, and health information such as appointment information.

174.    Due to Defendant's negligent creation, maintenance, preservation and/or storage of Plaintiff Delapaz's and the California Subclass members' electronic medical information, Defendant allowed Plaintiff Delapaz's and California Subclass members' individually identifiable medical information to be accessed and actually viewed by at least one unauthorized third party, constituting a release in violation of Cal. Civ. Code § 56.101(b)(1)(A).

175.    Defendant disclosed "medical information," as defined in CMIA, Cal. Civ. Code § 56.05(i), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code

§ 56.10(a). Plaintiff Delapaz and California Subclass members did not authorize Defendant's disclosure and release of their Personal Information that occurred in the Data Breach.

176. Defendant's negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiff Delapaz's and the California Subclass members' medical information in a manner that preserved the confidentiality of the information contained therein violated the CMIA, Cal. Civ. Code §§ 56.06 and 56.101(a). Patients' confidential medical information was accessed, viewed, and exfiltrated by an unauthorized third party or parties, and thus HCA negligently released medical information concerning Plaintiff Delapaz and California Subclass members. Accordingly, Defendant's systems and protocols did not protect and preserve the integrity of electronic medical information in violation of the CMIA, Cal. Civ. Code § 56.101.

177. Defendant violated the CMIA by negligently (1) failing to implement reasonable administrative, physical and technical safeguards to protect, secure and prevent the unauthorized access to, and acquisition of, Plaintiff Delapaz's and California Subclass members' Personal Information; (2) failing to implement reasonable data security measures, such as intrusion detection processes that detect data breaches in a timely manner, to protect and secure Plaintiff Delapaz's and California Subclass members' Personal Information; (3) failing to use reasonable authentication procedures to track Personal Information in case of a security breach; and (4) allowing undetected and unauthorized access to servers, networks and systems where Plaintiff Delapaz's and California Subclass members' Personal Information was kept.

178. Defendant's failure to implement adequate data security measures to protect the Personal Information of Plaintiff Delapaz and California Subclass members was a substantial factor in allowing unauthorized parties to access HCA's computer systems and acquire the Personal Information of Plaintiff Delapaz and California Subclass members.

179. As a direct and proximate result of Defendant's violation of the CMIA, Defendant allowed the Personal Information of Plaintiff Delapaz and California Subclass members to: (a) escape and spread from its normal place of storage through unauthorized disclosure or release; and (b) be accessed and acquired by unauthorized parties in order to, on information and belief, view, mine, exploit, use, and/or profit from their Personal Information, thereby breaching the confidentiality of their Personal Information. Plaintiff Delapaz and California Subclass members have accordingly sustained and will continue to sustain actual damages as set forth above.

180. Plaintiff Delapaz and California Subclass members were injured and have suffered damages, as described above, from Defendant's unauthorized release of their medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and are therefore entitled to nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1) or the amount of actual damages, if any, for each violation under Civil Code §56.36(b)(2).

181. Plaintiff Delapaz and California Subclass members also seek reasonable attorneys' fees and costs under applicable law including Federal Rule of Civil Procedure 23, California Civil Code § 56.35, and California Code of Civil Procedure § 1021.5.

**COUNT 7**

**CALIFORNIA UNFAIR COMPETITION LAW,**

**Cal. Bus. & Prof. Code §§ 17200, et seq.**

182. (On Behalf of Plaintiff Delapaz and California Subclass Members) Plaintiff Delapaz, individually and on behalf of the California Subclass, repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

183. In the alternative to the Tennessee Deceptive Trade Practice Claim, Plaintiff Delapaz brings a claim against Defendant for violating the California Unfair Competition Law.

184.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

185.    Defendant violated Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

186.    Defendant's "unfair" and "fraudulent" acts and practices include omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secured Plaintiff Delapaz's and California Subclass members' Personal Information.

187.    Defendant engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1780, et seq., the FTC Act, 15 U.S.C. § 45, HIPAA, and California common law.

188.    Defendant engaged in acts of deception and false pretense in connection with their accepting, collecting, securing, and otherwise protecting patient Personal Information and engaged in the following deceptive and unconscionable trade practices, including:

a.    Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiff Delapaz's and Class Members' Personal Information;

b.    Failing to comply with industry standard data security standards during the period of the Data Breach;

c.    Failing to comply with regulations protecting the Personal Information at issue during the period of the Data Breach;

d.    Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

e.     Failing to recognize in a timely manner that Plaintiff Delapaz's and other Class Members' Personal Information had been compromised; and

f.     Failing to timely and adequately disclose that Plaintiff Delapaz's and Class Members' Personal Information had been improperly acquired or accessed.

189.   Plaintiff Delapaz's and Class Members' Personal Information would not have been compromised but for Defendant's wrongful and unfair breach of its duties.

190.   Defendant's failure to take proper security measures to protect sensitive Personal Information of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiff Delapaz's and Class Members' Personal Information.

191.   Plaintiff Delapaz and California Subclass members conferred a benefit on Defendant— payment for medical services—in reliance on Defendant's omissions and deceptive, unfair, and unlawful practices. Had Defendant disclosed in any form, whether verbally, in writing, or via electronic disclosure that they did not adequately secure patients' Personal Information, Plaintiff Delapaz and California Subclass members would not have sought or purchased services from Defendant.

192.   As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff Delapaz and California Subclass members were injured and lost money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant as they would not have paid Defendant for goods and services or would have paid less for such goods and services but for Defendant's violations alleged herein.

193.   Plaintiff Delapaz and California Subclass members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's

unfair, unlawful, and fraudulent business practices or use of their Personal Information; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## PRAYER FOR RELIEF

194. Plaintiffs ask the Court enter a judgment in their and Class Members' favor for:

a. permanent declaratory and injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

b. compensatory, consequential, and general damages in an amount to be determined at trial;

c. disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of its unlawful acts, omissions, and practices, in amounts to be determined at trial;

d. statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

e. costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

f. pre- and post-judgment interest at the maximum legal rate; and

g. all such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated:  July 18, 2023

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:  */s/ Mark P. Chalos*
Mark P. Chalos

Mark P. Chalos
mchalos@lchb.com
Kenneth S. Byrd
kbyrd@lchb.com
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
222 2nd Ave S #1640
Nashville, TN 37201
Tel: 615-313-9000

Jason L. Lichtman
jlichtman@lchb.com
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLC**
250 Hudson Street, 8th Floor
New York, NY 10013-1314
Tel: 212-355-9500
*Pro Hac Vice Forthcoming*

Michael W. Sobol
msobol@lchb.com
Jallé H. Dafa
jdafa@lchb.com
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLC**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
*Pro Hac Vice Forthcoming*

John Spragens (TN Bar No. 31445)
john@spragenslaw.com
**SPRAGENS LAW PLC**
311 22nd Ave. N.
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533

*Attorneys for Plaintiffs*